The Honorable, the judges of the United States Court of Appeals for the 4th Circuit. Oh yay, oh yay, oh yay. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit are admonished to give their attention for the court is now sitting. God save the United States and this Honorable Court. Good afternoon everybody. Welcome to the 4th Circuit. We have four cases on the calendar for this afternoon. The first case up is Triplett v. Saul and Mr. Farrell, whenever you're ready. Thank you, Your Honor. My name is Clifford M. Farrell, representing appellant Kimberly Triplett. I wanted to start briefly by pointing out what this case is not about. This is a Social Security claim following the sequential evaluation that was denied at step 2 for lack of a severe medical impairment. It is not about whether the claimant meets or equals a listing or what her residual functional capacity might be or whether she can do her old work or any other kind of work. According to the Social Security's rulings, in particular ruling 8528, at the second step of the sequential evaluation, medical evidence alone is evaluated in order to assess the effects of the impairment or impairments on the ability to do basic work activities. It's a medical question. That's important because the judge, the administrative judge, and at points in time the records have suggested that, well, and I think have suggested that perhaps she's not taking enough medication or not doing some of the things she should be doing. In fact... Mr. Farrell, this is Judge Thacker, what's your best evidence of severe impairment here? The fibromyalgia is a by exclusion diagnosis. In this record, the treating physician, Dr. Gray, has indicated, actually there are three doctors that have all indicated it is severe. Dr. Gray, Dr. Srusco, and Dr. Rutherford. The treating physician, Dr. Gray, his records document fibromyalgia, myofascial pain, various impairments, which the judge conceded were medically determinable impairments. So there's no question she has the diagnosis. He just found that they weren't severe. Well, Mr. Farrell, after the date for the, after the filing date for disability, what, didn't Dr. Gray just primarily treat her for things like colds and other more minor things, not so much the fibromyalgia? He did not, Your Honor. Dr. Gray referred Ms. Triplett out for various work value, or various workups on her medical problems. He filed after the filing date for disability? Yes, Your Honor. All right, go ahead. That's fine. He referred her out for a sleep apnea study at 399. That was, because that is often associated with, with fibromyalgia. Orthopedics examined her, exhibit 590, or page 591, because they were looking for an orthopedic basis. There were other, there were other, he did refer her out for a common eye exam and for a colonoscopy that are relevant here. But he did. I don't know what, what about the fact that as of July 10th, 2015, she was going to the gyms three times a week and doing strength training with weights and cycling? I don't know that. That is exactly, that is exactly what part of the prescribed treatment is for fibromyalgia. You're supposed to do those things to try and minimize some of the symptomatology and to increase some of your strength. So, doesn't the fact that she's able to do those things three times a week, isn't that some indication that she may not be severely impaired to the point of being disabled? I don't, it may come in an evaluation of residual functional capacity later on, but at this step as to whether it is, whether her impairments are so baseless as to not warrant any evaluation of the claim, I don't believe that factors in here. I thought the test was whether or not the impairment significantly limits his or her physical or mental ability to do basic work activities, and why wouldn't the ability to do what Jit Stacker just described be relevant on that point? Because at this point in the process, in the sequential evaluation, it is a medical determination. Things that go to the RFC, and those clearly go to RFC, can she do sedentary work, can she do her past work, other work, those are clearly relevant. But as the Commissioner's rulings point out, it is strictly a medical determination. And it wasn't, I want to point out, it was not just Dr. Gray that said these are severe medical conditions. Both the state agency doctors, at record 98 and record 109, both Dr. Sorosco and Dr. Rutherford specifically indicated that the, I think their problem was they couldn't decide if it was fibromyalgia or what it was, whatever it was, they both indicated that it was severe. Page 90. Can I ask you a question? Yes. I'm sorry, I didn't mean to cut you off, but I think the state's doctors both said it was severe. Are there other cases, I mean, is this happening frequently? Is this the first time you've seen this, where fibromyalgia is deemed not severe at step two? Is this unusual, or I just don't have a feel for this? I would not say it's unusual. I would not say it's frequent, either. And I know that's not very helpful, but I have seen cases in that, and I think we cited one case from the I've had probably half a dozen times in my career where an impairment was found not severe, some of which have been reversed by appellate courts, and some of, I think they've all been. I mean, the But fibromyalgia, I'm sorry, my question, fibromyalgia was deemed not severe at step two? I know sometimes ailments are deemed not severe, but I was just wondering. Fibromyalgia, I have rarely seen, and that's because there is no test that can confirm its presence yet. And so rather than error that way, most judges say, I'm going to find it severe, and then they evaluate residual functional capacity and whether they can do otherwise. But isn't that what happened, Mr. Farrell? Isn't that what happened in this case? Didn't the judge ultimately get to the residual functional capacity and make a finding that she could do the work that she had done previously with some limitations? He did not, Your Honor. He does mention in what I consider sort of a dicta opinion at near the end of his decision that she could possibly go back to her past work. The sequential evaluation is a very procedural process, and at no point here did he evaluate whether she met or equaled the listings. I guess he must have assumed that in order to get to the step four evaluation with respect to residual functional capacity. Now, it may be that the argument is that his opinion, or her opinion, I think it was a woman, ALJ, was colored by the fact that she didn't perceive the impairment to be severe. Maybe that's the response, but she did. Didn't she get to the issue of whether or not she could do work with certain limitations? She mentioned in the last paragraph, one of the last paragraphs of her decision, she does discuss that. But the problem is the rulings and regulations are very clear. Before you get to step five, you have to go through step four. Before you get to four, you have to go through three. You can't go from it's not a severe impairment to plus she can work. It defeats the whole purpose. That's why they set up the sequential evaluation, so all claims are evaluated the same way, so the claimant always understands what's going on. In your mind, ALJ, if she felt confident enough about the step two analysis, should have just stopped right there and done nothing more? That's what the rulings say. I think 8528 specifically says, you go through the steps in order, and at any point, you stop. Now, certainly there are occasions where that well, maybe they can do some of their old work, but I'm going to go ahead and discuss these other jobs. I certainly understand that. But to go from not severe, meaning to minimus, no significant limitations, to she can do her past work with nothing, no discussion of the other steps in between, is just not the way the analysis goes, especially when the state agency doctors agreed with the treating doctor that she's significantly... Do you think that, and I agree with you, it appears that the ALJ made a mistake with respect to the opinions of the state doctors, but let's assume that she had accepted all those opinions as fact, that they had all come to a conclusion that, in their minds, that this was a severe impairment. But the ALJ could have, I suppose, nonetheless, discounted those opinions in light of the record evidence that suggested that she could do a lot of the things that would appear to be inconsistent with the finding of a severe impairment, like going to the gym, like going to amusement parks. I think she went to Disney World and did some other things. ALJ could have done that, right? The judge could have considered those. I think, quite honestly, that there's had to be a step two denial, because if you look at the medical opinions of the various doctors, at any other step, at step four or step five, it would have been approved. The only way to really deny benefits for somebody of her age is to say her impairments aren't severe, because if... It's not the ability to do something on a short five-minute, one-day, one-week basis. It is the ability to do them on a sustained eight-hour-per-day, five-day-per-week basis, and that's where the treating physician was saying she's going to have days where she's going to miss work because of her problems. The consultants were saying she's going to have problems making it through... Certainly can't do more than six hours of sitting and two hours of standing and walking. So there were significant limitations, and at her age, and depending on what the judge then, when properly evaluating the evidence, I think this judge would have been likely to have approved this plan. In looking through, Dr. Gray, as I pointed out, has been seeing her since 2013. He's not the only doctor to have diagnosed the fibromyalgia, though. The orthopedic doctor who examined her for her toxics specifically made a diagnosis of fibromyalgia as well, 691. The rheumatologist was ruling out some of the more rheumatological disorders and also said, it looks to me like fibromyalgia is high on the list. That's a 407. Then they have the MRIs, and he sends her out for these different tests. Ultimately, by the time he fills out the assessment in 2017, he's now gone through the sleep apnea. He's gone through all of the other studies and reached the point where he can say, this is what's going on, and it's for those reasons. She tried the physical therapy. That didn't work. She had the top tests to rule out other diagnoses, and she had injections. She tried different medications. In short, she did everything I think she could have done, and I think that if this was truly a non-severe impairment, I don't think we would see a record of this much referrals out for consultative examinations and specialist evaluations and the consistency of her complaints of pain. Do they fluctuate? Absolutely. Does that mean it's not severe? Absolutely not. I don't want to waste my time unless there's another question. Thank you, Mr. Farrell. Mr. Lussier will hear from you. Good afternoon, Your Honors. My name is John Lussier from the U.S. Attorney's Office in Richmond, and I represent the appellee, the Commissioner of Social Security. Under this court's precedence at step two or otherwise, if a symptom can be reasonably controlled by medication or treatment, it's not disabling. That's what the ALJ found here and properly made that factual finding supported by substantial evidence that Ms. Triplett's symptoms of her fibromyalgia, pain, and chronic fatigue were reasonably controlled by medication or treatment, and that's supported by the record. Her primary care physician, Dr. Gray, after she had complained of pain, referred Ms. Triplett to a specialist, referred her in March. Ms. Triplett saw that specialist, a rheumatologist, beginning in June of 2014, went back in July of 2014. In July, the rheumatologist diagnosed fibromyalgia and prescribed a medication for it, Ultraset or Tramadol. She returned to the rheumatologist in September of 2014, and the record for that visit states that I report that Ms. Triplett had good tolerance of treatment and good symptom control. She didn't go back to the rheumatologist for a year, roughly, until July of 2015. In July of 2015, the record states that she had tried the medication Ultraset and that it helped and that she would continue to use it. As Judge Thacker pointed out, in both September of 2014 and July of 2015, she also reported exercising two or three times a week during those visits. Mr. Lussier, your colleague on the other side, excuse me, Judge Diaz here, ended his argument with a summary of Dr. Gray's opinions that the claimant in this case would necessarily have a number of, the way he said, a number of bad days that would prevent her from being able to work and would necessitate bed rest and the like. Did you recall hearing that summary? I do recall. So what about that? What are we supposed to do with that? Well, the ALJ discounted Dr. Gray's opinion, and that opinion is a November 2017 fibromyalgia questionnaire where Dr. Gray went down and checked certain items on that list. Just to be clear, Mr. Lussier, this is the treating physician, right? So aren't we supposed to give some extra level of credence to that opinion? Well, the ALJ, the treating physician rule applies unless the ALJ finds, and of course, the finding has to be supported by substantial evidence, that the opinion of the treating physician is contradicted, is inconsistent with other record evidence. And we have that here. The ALJ properly made that finding here supported by substantial evidence because, as just Judge Thacker pointed out, towards the 2017 period, after Ms. Triplett stopped seeing the rheumatologist, and the last time that she did was in August of 2015, after that, Dr. Gray saw Ms. Triplett for things like a cold, hypertension, Ms. Triplett had a fall where she injured herself and was being treated for pain from that fall. After the August 2015 ceasing of the rheumatologist visits, there are no complaints with respect to fibromyalgia after that point. And at that 2015, the last visit with the rheumatologist, Ms. Triplett, by self-report, was feeling better and rested better and responded well to the medication that she was on. So the opinion of Dr. Gray, yes, it's a treating physician opinion, but there is other record evidence that the ALJ found contradicted that with respect to symptoms of fibromyalgia. And specifically that at that point, by November of 2017, when Dr. Gray rendered that opinion, she hadn't seen a rheumatologist at that point for over a year. And the last time she saw a rheumatologist, which of course was specific to treating the fibromyalgia, she reported that she had improved symptoms at that point. And so I think that the as a whole, yes, the ALJ did discount the 2017 opinion of Dr. Gray, but that's supported by substantial evidence. The ALJ's decision to do so, that is supported by substantial evidence. What about the fact that the ALJ just simply got the opinions of the state physicians wrong, just as a matter of fact? Well, Judge Diaz, I think your question to out, well, there are two answers. One of which is, as you pointed out, Your Honor, the ALJ made the additional finding that even if the ALJ had accepted those opinions of severity, the ALJ would have nonetheless found and did nonetheless find that Ms. Triplett was not disabled because she could, even at a sedentary level, the lowest level of work exertion, she could return to her past work as a vocational rehabilitation counselor at that sedentary level because that's how it's done generally in the national economy. So even if the ALJ were incorrect in that factual finding, as you described it, nonetheless, the ALJ would have accepted it and found her non-disabled. And the other reason is because the ALJ didn't discount the opinions of the state agency physicians sort of in a vacuum. The ALJ did so while looking at the whole record and for the same reasons that I just said, which is that her course of treatment showed consistent improvement from the time she started seeing a rheumatologist to the time that she stopped and she had stopped. So I will tell you one of my many At step two, this is a medical assessment and there are three doctors, only three doctors, but three doctors in agreement that this is severe, that this meets the step two medical criteria. The ALJ misunderstood that. The ALJ thought that the doctors were split two to one and that she was agreeing with two of them that it was non-severe over the objections of the treating physician, which is a more kind of standard setup. So I can see that that probably seems sort of familiar, but that's a colossal error to make. And I am left without much confidence that it would not have infected the rest of the way the ALJ was looking at this record, that she misunderstood that there was actually unanimous medical testimony on the medical question of whether her impairment is severe and the ALJ didn't understand that. I don't understand how we can be confident that that error doesn't affect the rest of the analysis. Judge Harris, I take your point. I disagree that it's a colossal mistake in this respect, which is that the ALJ, yes, made an error in saying that the state agency physicians found non-severe, but the ALJ then went the next step and said, listen, even if I agreed with that and found that the impairment to be severe, I nonetheless would find that Ms. Triplett was not disabled. Right, but my concern is that the treating physician doesn't agree that she can do this work if the sedentary accommodations are made. And so my concern is that her misunderstanding of how the doctors aligned on this question would have affected her decision to discount the treating physician's opinion. I just don't see how we can separate them out so cleanly. Your Honor, I think that on this record, combined with the ALJ's decision, you can get some comfort that it didn't infect the rest of the ALJ's decision because the ALJ went through the entire longitudinal record from the beginning of complaints of pain from all of that medical evidence. Well, we don't have to get into everything, but I did have some concerns about the ALJ's analysis of the longitudinal record. And I would have expected that for an ALJ finding that a condition is well controlled with medication, there would have been some discussion of all the side effects from the medication and the degree to which those side effects sort of impaired her ability to use the medications to control her symptoms to the point where she ended up in the hospital with side effects from the medication. And the ALJ doesn't mention any of that. So I actually was not as reassured by the ALJ's assessment. Well, Your Honor, there's a recorded in the medical record side effects for one of the medications, Celebrex. Ms. Triplett testified at the hearing, which was in December of 2017, I believe, that she had experienced side effects from Tramadol, which was the medication that she was on. However, she was on Tramadol for more than a year and there's no record of any allergic reaction to it within that year. And in fact, as I said earlier, she was feeling better from using it and showed some positive influence on her symptoms. So there is a recorded instance of a reaction to one of the medications, but the record doesn't show a recorded instance of a reaction to the medication that she was on, which is Tramadol Ultraset. At step two and otherwise, under this court's precedence in the Gross v. Heckler case, if a symptom can be reasonably controlled by medication, it's not disabling. The ALJ here made that factual finding and the finding was supported by substantial evidence. Thank you, your honors, if there are no more questions. Oh, I do have just one quick question. So the ALJ relied on some other things too, which we have, and the ALJ didn't have the benefit of our decision in Arrakis, but we later clarified that you can't rely on things like a normal range of motion, like the fact that the treatment was sort of routine kind of conservative treatment. All of that is stuff you're not would be, well, it doesn't matter. Like we can take that stuff out. You just kind of harmless error. She shouldn't have looked at that. She did, but there's no reason to think it affected. There's no reason to think any of these mistakes affected her analysis, her end analysis. Yes, your honor. I agree. But I would also add that I think that Arrakis is a, shows what kind of case this is not. And so I don't read Arrakis as saying that an ALJ, for example, can never look at the type of treatment a claimant receives. I just think that Arrakis says, if the ALJ does so, the ALJ has to make a finding that's supported by substantial evidence. And so in the Arrakis case, the claimant was not receiving, the court found, the claimant was not receiving routine treatment. She had seen a rheumatologist for 20 years, had tried various types of medications, had been referred to different specialists, had received injections, and so on and so forth. And in this case, we have something that's fundamentally different. Ms. Tricklett was referred to a specialist, was treated by that specialist, reported symptom control, and then stopped seeing that specialist. And after that, only saw her primary care physician for routine matters. So I think that in this case, it's just a different case than Arrakis was. Just to follow up on that, so, and Judge Harris talked earlier with your colleague about fibromyalgia, and I'll confess that I'm not an expert with respect to that. I know that it afflicts a great number of people, and it's unique in the sense that there's no tests for it. It's largely subjective. But that's sort of a bit of a conundrum, right, when it comes to disability claims, because if it is subjective, then in some cases, you know, that subjective analysis or evaluation of pain may, you know, may be less than truthful or less than full and fulsome. And so you have to, it would seem to me logical that you would have to consider other diagnoses. And so I don't read Arrakis, and I think you've made this point as suggesting that ALJ is forever barred from considering that kind of evidence in the face of a claim by, a claimant that she, he or she is feeling subjective pain, right? You accept that, obviously, but then you look to the record and see if, in fact, that subjective pain is consistent with the daily activities and all the other stuff that appears to be in this record. I mean, is that fair? Yes, Your Honor, I think that is fair. I think that Arrakis says that there's a particular, the ALJ errs in requiring objective medical evidence that confirms a diagnosis of fibromyalgia, but that's not what happened here. The ALJ here said, yes, she does have fibromyalgia. It's the next step, is that, are the symptoms from that diagnosis, are they controlled by medication and treatment? And in making that finding, part of what the ALJ relied on was Ms. Triplett's subjective reports to her doctor that she was feeling better after she started taking the medication when she was referred to the rheumatologist. Okay. My colleagues have any other questions? I don't. Thank you. Thank you, Mr. Lussier. Mr. Fair, you've got some time for rebuttal. Go ahead. Thank you. The fact that Ms. Triplett was responding to not working and taking medication, I think, helps support her claim. And it draws me back to the part of the judge's decision where he gave the state agency opinions that will wait. It was determined that the claimant did not have a severe impairment, but then she was reduced to sedentary exertion. And that was the part that he found that was inconsistent. This level of limitation is not supported. The evidence shows she has only received routine treatment, not required specialized treatment, rehab, or extensive follow-up. In fact, the record shows just the opposite, that in fact, she was getting all the appropriate treatment, all managed through her treating physician. It is a subjective impairment. And I would simply point out that not only did both doctors for the state say it was a severe impairment, they both noted that can one or more of the individual's medically determinable impairments, which includes her fibromyalgia, be expected to produce the individual's pain and symptoms? That's at record 98 and at record 109. And the answer by the doctor was yes. And then the next question, are the individual statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence? Both state agency physicians answered yes. Her symptoms are real. They're consistent with the diagnosis. And they're substantiated. Now we have three doctors. All three doctors concur that those symptoms are substantiated by the objective medical evidence alone. And that's the last word in the question, alone, based on the medical evidence. And it is difficult. And I spent a lot of time in preparation for this, trying to distinguish between what does the medical evidence say and what is RFC-related issues. And it is to say that there is no severe medical impairment is simply not supported by the evidentiary record. All three physicians agree it is. The symptoms are consistent. The symptoms are supportive of the diagnosis. And that they are, that her complaints are consistent with the record. Mr. Farrell, can I ask a question? You made an argument, you said something in your opening about, it appears that had the ALJ actually gotten past step two, that she would have necessarily found that she was disabled. And I'm not sure I understood why you think that's the case, why that can be the only conclusion based on this record. So maybe you can explain that to me. Sure. I believe that because the nature of the problems with fatigue, the dizziness, which are all parts of fibromyalgia, the absences from work, I think that those things all combine to leave an administrative law judge in a difficult position. For example, if she has dizziness, that impairs her ability to walk. If she is going to miss three days a month or more, or even just two days a month, that is inconsistent with competitive work activity because you can't be absent 24 days a year from a competitive work environment. Okay. All right. Thank you very much. The case is submitted. We very much appreciate your arguments and regret that we could not be live in Richmond, but nonetheless, thank you for your arguments. And we would normally step down the bench. Obviously, we can't do that to shake your hands, but know that we are grateful to you both for your presentations here this afternoon and pray that you will be safe and well. So thank you again. Thank you. Same to you, Judge.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris